EXHIBIT A-6

| | |
|---|---|
| DISTRICT COURT, BOULDER COUNTY<br>STATE OF COLORADO<br>1777 Sixth Street<br>Boulder, CO 80302 | DATE FILED: December 8, 2022 12:59 PM<br>FILING ID: B453439839ED3<br>CASE NUMBER: 2022CV30839 |
| **HEIDI MYERS**<br><br>    Plaintiff,<br><br>v.<br><br>**NSF INTERNATIONAL**<br><br>    Defendant. | ▲ **COURT USE ONLY** ▲ |
| *Attorneys for Plaintiff:*<br>Iris Halpern, #53112<br>Ciara M. Anderson, #55259<br>Rathod \| Mohamedbhai LLC<br>2701 Lawrence St. 100<br>Denver, Colorado 80205<br>(303) 578-4400 (t)<br>(303) 578-4401 (f)<br>ih@rmlawyers.com<br>ca@rmlawyers.com | Case No: 22-CV-30839<br><br>Division: 5 |
| **AMENDED COMPLAINT AND JURY DEMAND** ||

Plaintiff Heidi Myers, by and through counsel, Ciara M. Anderson and Iris Halpern of Rathod \| Mohamedbhai LLC, file this Complaint and Jury Demand against Defendant NSF International and in support allege as follows:

## I.      INTRODUCTION

Although the law is well-settled that employers cannot treat women differently because of their pregnancy or because they have young children, this case illustrates the barriers and intersectional discrimination within the workplace faced by women who become pregnant or who have young children. Plaintiff Heidi Myers has spent nearly two decades becoming a global leader in the field of Talent Acquisition ("TA"). Ms. Myers knows that pregnant or not, she is qualified

and capable to become the Director of Global Talent Acquisition for a global public health and safety organization like NSF International ("NSF"). Thus, when applying for the position with NSF, she did not disclose her protected status as a pregnant woman until NSF told her it was putting a job offer together for her. Unfortunately, upon learning that Ms. Myers was pregnant and required leave at the time of or soon after starting her position, NSF discriminated and retaliated against Ms. Myers by refusing to hire her in violation of the Colorado Anti-Discrimination Act ("CADA"). Ms. Myers brings the following claims against Defendant NSF: (1) Unlawful Pregnancy Discrimination in violation of CADA; (2) Unlawful Sex-Stereotyping and "Sex-Plus" Discrimination in violation of CADA; and (3) Unlawful Retaliation in violation of CADA.

## II.  PARTIES, JURISDICTION, AND VENUE

1.      At all relevant times, Plaintiff Heidi Myers was and is domiciled in the State of Colorado in Jefferson County.

2.      Defendant NSF International is a foreign corporation duly registered with the Colorado Secretary of State that did, during all relevant times to this action, and continues to do, business in Colorado.

3.      The Court has jurisdiction over this matter pursuant to C.R.S. § 13-1-124, as the alleged commission of tortious acts occurred within the State of Colorado.

4.      Venue is proper in this Court pursuant to C.R.C.P. 98, as the allegations contained herein occurred within the boundaries of Boulder County.

## III.  ADMINISTRATIVE EXHAUSTION

5.      Plaintiff filed her charges of discrimination with the Colorado Civil Rights Division ("CCRD") and Equal Employment Opportunity Commission ("EEOC") on December 21, 2021.

6.      In her Charge for Discrimination, Ms. Myers alleged that NSF engaged in retaliation and sex and pregnancy discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII") and the Colorado Anti-Discrimination Act ("CADA") when the company refused to hire her on the basis of her sex, pregnancy status, and/or her request for maternity leave.

7.      The CCRD issued a Notice of Right to Sue on September 7, 2022.

8.      Plaintiff files this action within ninety (90) days of receiving her Notice of Right to Sue.

## IV.      FACTUAL ALLEGATIONS

### A.  Heidi Myers' Career Trajectory

9.      Ms. Myers has a breadth of experience which makes her indubitably qualified to be the Director of Global Talent Acquisition at a global public health and safety organization like NSF.

10.     Ms. Myers has worked in the Talent Acquisition workforce for approximately nineteen years, and her experience over the past ten years alone highlights her qualifications as a leader in Global Talent Acquisition.

11.     For example, beginning in 2010, Ms. Myers worked as the Talent Acquisition Supervisor for EQT Corporation. In this role, Ms. Myers developed and oversaw all aspects of Talent Acquisition for an 1,800+ person organization.

12.     Between 2014 and 2015, Ms. Myers was employed as Newalta Environmental Services, Inc.'s Senior Talent Advisor. Ms. Myers developed and oversaw talent acquisition for the United States and Canada and conducted bi-annual talent reviews with business unit leaders to effectively determine strategic and operational workforce planning, among other things.

13.     In 2015, Ms. Myers became the Global Recruiting Operations Senior Manager at Service Source International. Through this position, Ms. Myers expanded her talent acquisition portfolio and began creating a global talent acquisition strategy and workflow for North and Latin America ("NALA"), the Pacific Rim and Japan ("APJ"), and across the United States, Canada, Mexico, South America, and Europe, Middle East and Africa ("EMEA").

14.     Also in 2015, Ms. Myers' years of hard work ultimately landed her a position at Ball Corporation—the world's leading manufacturer of aluminum packaging for beverage, personal care, and household products—where she became a true global talent acquisition leader.

15.     At Ball Corp., Ms. Myers started as the manager of Talent Acquisition, building and leading the Talent Acquisition team in North America.

16.     Ms. Myers quickly advanced to become the Director of Global Talent Acquisition at Ball Corp.  In this role, oversaw all internal hiring within the organization and had a team of 30-35 professionals reporting to her across the globe. She was also responsible for developing strategy and executing recruiting efforts across the EMEA.

17.     In addition to being responsible for all of Ball Corp.'s internal hiring, Ms. Myers was also responsible for leading several global strategic projects. She developed enterprise-wide processes, programs, and tools needed to acquire talent for the company.

18.     Ms. Myers worked at Ball Corp for approximately six years until 2021, and within any given year, Ms. Myers oversaw hiring for 500-3,300 individuals around the globe.

19.     Along with her success at work leading up to and in 2021, Ms. Myers was set to complement her family life with the addition of her second child and was due to deliver her son in January 2022.

B.  **Ms. Myers Applies to NSF International**

20.     NSF is a public health and safety organization that purports to have a supportive global community and inclusive culture.

21.     On October 14, 2021, Ms. Myers applied for the Director of Global Talent Acquisition at NSF through a headhunter at HR Connections, Debbie Shapiro.

22.     Shortly after Ms. Myers submitted her application, Ms. Shapiro messaged Ms. Myers on LinkedIn to discuss the role at NSF.

23.     On October 20, 2021, Ms. Myers spoke to Debbie Shapiro on the phone regarding the position and the salary range for the role, which was $185,000-$200,000 annually with a 20% bonus.

24.     Following the phone call, Ms. Shapiro submitted Ms. Myers' resume to NSF's Chief Human Resources Officer (CHRO) Karen Kreza for review.

25.     Two days later, on October 22, 2021, Danielle Cosgrove, acting as the Head of Talent Acquisition for NSF emailed Ms. Myers to schedule an interview.

26.     Ms. Cosgrove's role at NSF was Principal Human Resource Business Partner, but she was filling in as Head of Talent Acquisition for the time being.

27.     Fearing that potential employers might view her pregnancy as a reason not to hire her, Ms. Myers chose not to disclose her status as a pregnant person to interviewers.

28.     In the week leading up to the interview, which took place over Microsoft Teams, Ms. Myers angled her camera in a manner that ensured that interviewers would not see that she was pregnant.

29.     During Ms. Myers' first interview with NSF, Ms. Cosgrove mentioned that while she was the acting TA leader, she was "just keeping the lights on for the time being." She also said that NSF needed a "true Global Talent Acquisition Leader."

30.     At the end of the initial interview, Ms. Cosgrove appeared to be impressed with Ms. Myers and asked her to do a second interview with two other Human Resources Partners, Josh Reyes and Sheri Threadgill.

31.     On November 2, 2021, Ms. Myers attended a second interview with Mr. Reyes and Ms. Threadgill.

32.     Ms. Myers again angled her cameras so that the interviewers could not see that she was pregnant.

33.     Two days after her second interview, Ms. Myers received a message from Ms. Cosgrove that NSF's CHRO would "love the opportunity to speak with [Ms. Myers] about the Global TA role at NSF," and Ms. Cosgrove scheduled Ms. Myers' third interview with NSF for November 10, 2021.

34.     Leading up to Ms. Myers' third interview, HR Connections Debbie Shapiro called Ms. Myers to discuss Ms. Myers' interest in the position at NSF. Ms. Myers inquired if there were any changes to the salary range that they previously discussed on October 20, 2021 and learned that the company agreed to adjust the salary range upward to $230,000 plus a 20% bonus.

35.     Given that the salary range was negotiated on a candidate-by-candidate basis, NSF's willingness to increase the salary range for Ms. Myers reflects her qualifications for the position and desire to recruit her.

36.     On November 10, 2021, Ms. Myers' met with NSF's CHRO, Ms. Kreza, for her third interview.

37.     The interview went exceptionally well. During the interview, Ms. Kreza commented that Ms. Myers would be part of a holiday video, reflecting NSF's desire to hire Ms. Myers before the upcoming new year. At the end of the interview, Ms. Kreza told Ms. Myers that she would like to move forward with an offer for Ms. Myers as long as she was interested in the job.

38.     Ms. Myers said that she was definitely interested in the job and did not have any reservations whatsoever with the company or position.

C.   **Ms. Myers Discloses Her Pregnancy After Which NSF Elects Not to Hire Her**

39.     Immediately after her November 10 interview, Ms. Myers messaged the HR Connections headhunter, Ms. Shapiro, on LinkedIn to reiterate her interest and excitement about the position and tell her that Ms. Kreza would be putting an offer together for her.

40.     Given how quickly the interview process went with NSF, Ms. Myers disclosed to Ms. Shapiro that she was interviewing at another company and was waiting to hear back about their hiring decision, which would be announced the following week.

41.     Ms. Myers also shared with Ms. Shapiro that she was pregnant and that her due date would be in January of 2022.

42.     This was the first time Ms. Myers mentioned her pregnancy to anyone during the application process at NSF or HR Connections.

43.     Ms. Shapiro then asked Ms. Myers to call her, and the two chatted on the phone about Ms. Myers' enthusiasm for the role and the details of her message.

44.     Ms. Myers told Ms. Shapiro that she could start in the position immediately and take leave in early 2022 (which she did not expect to be paid during by any means), or she could hold off on starting at NSF until after she had the baby.

45.     Ms. Myers reiterated her flexibility multiple times. Even when Ms. Myers told Ms.

Shapiro about her pregnancy, she expressly stated her willingness to be flexible:

> I want to make sure you, and they, know that I'm currently pregnant and due the
> latter half of Jan. Given that, I'd be happy to start remote asap, then take my leave,
> or do all the paperwork and such now and postpone starting until after [I] have the
> baby. **Either way I'm flexible and would want to work with them to figure out**
> **what makes the most sense.** Thanks!

46.     Ms. Shapiro indicated that she thought Ms. Kreza would want her in the role as

soon as possible so that Ms. Cosgrove, who was filling in for the position, could return to her

position as NSF's Principal Human Resource Business Partner.

47.     During the phone call, Ms. Shapiro informed Ms. Myers that Ms. Kreza messaged

her and asked her for Ms. Myers' feedback. Ms. Kreza also told Ms. Shapiro that she was going

to have dinner with the CEO later on November 10, and she would check with him to see if he

needed to meet with Ms. Myers prior to her receiving a formal offer.

48.     On November 12, 2021, Ms. Myers followed up with Ms. Kreza to thank her for

taking the time to interview her and reiterate her excitement about the company and position.

49.     The following Monday, on November 15, 2021, at approximately 10 a.m., Ms.

Kreza responded to Ms. Myers that she enjoyed meeting her and that NSF would be in touch.

50.     The same day, at approximately 11:45 a.m., Ms. Shapiro texted Ms. Myers that she

planned to talk to Ms. Kreza at 2 p.m. MST (4 p.m. EST).

51.     An hour after Ms. Shapiro spoke to NSF's CHRO, Ms. Shapiro left Ms. Myers a

voicemail informing her that NSF was not moving forward with hiring Ms. Myers and would

instead be hiring the position internally.

52.     Upon information and belief, Ms. Shapiro told Ms. Kreza that Ms. Myers was pregnant or that she would need time off to give birth, and NSF retracted its offer because it did not want to hire Ms. Myers because she was pregnant.

53.     On November 15, 2021, Ms. Shapiro told Ms. Myers that NSF hired Danielle Cosgrove to fill the TA position and would be hiring a new HR person to fill Ms. Cosgrove's role.

54.     Additionally, Ms. Shapiro told Ms. Myers that it was very rare for a company to rescind an offer the way NSF rescinded Ms. Myers.

55.     In short, NSF learned Ms. Myers was pregnant and would require maternity leave before or shortly after starting the position.

56.     Within an hour of Ms. Shapiro informing NSF that Ms. Myers was pregnant, NSF suddenly decided to go a "different direction" and hired a current employee, Ms. Cosgrove, who was well-known to the company, would not require immediate leave, and was not at that time pregnant.

57.     Following its refusal to hire Ms. Myers, NSF has pretextually attempted to justify not hiring Ms. Myers with reference to its decision not to hire any outside candidate and instead promote Ms. Cosgrove, claiming this decision was due to budgetary reasons.

58.     Despite filling the global talent acquisition role internally, NSF still intended to hire an HR Partner to replace Ms. Cosgrove, which would still have cost as much as hiring Ms. Myers for the TA role.

59.     Moreover, it does not matter that Ms. Cosgrove was already employed at NSF because the discrimination and retaliation in this matter lies in NSF's decision not to hire Ms. Myers only after learning she was pregnant and needed leave shortly after starting in this new top-level, executive position.

60.     Ms. Myers has significantly more experience as a global talent acquisition leader than Ms. Cosgrove. Indeed, Ms. Cosgrove apparently believed Ms. Myers was a better person for the position than herself because Ms. Cosgrove advanced Ms. Myers to another interview.

61.     NSF's sudden change of course to rescind Ms. Myers' offer and instead hire a non-pregnant employee just two days after Ms. Myers disclosed that she was pregnant, coupled with Ms. Myers stellar qualifications and skill set, provide ample evidence that NSF discriminated against Ms. Myers because of sex, including her pregnancy status and upcoming maternity leave.

### V.     CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**C.R.S. § 24-34-402.3**
**Unlawful Pregnancy Discrimination**

62.     Plaintiff hereby incorporates all the paragraphs of this Complaint as though fully incorporated herein.

63.     CADA prohibits employers from discriminating against an applicant for a job or an employee for being pregnant. C.R.S. § 24-34-402.3. Specifically, "an employer shall provide a reasonable accommodation to perform the essential functions of the job to an applicant for employment . . . for health conditions related to pregnancy or the physical recovery from childbirth." C.R.S. § 24-34-402.3(1)(a).

64.     As a pregnant woman, Ms. Myers was a protected person under CADA.

65.     Ms. Myers was a highly qualified candidate for the Director of Global Talent Acquisition position at NSF.

66.     NSF discriminated against Ms. Myers based on her status as a pregnant woman.

67.     NSF's refusal to hire Ms. Myers occurred under circumstances giving rise to an inference of illegal pregnancy discrimination, including but not limited to, the abrupt withdrawal

of its intended job offer and the fact that NSF treated Ms. Myers less favorably than her similarly situated non-pregnant counterparts.

68.     NSF's purported reasons for not hiring Ms. Myers were mere pretext for unlawful pregnancy discrimination.

69.     Ms. Myers' pregnancy was a motivating factor in NSF's adverse treatment of her, including but not limited to its refusal to hire her.

70.     NSF engaged in this conduct with malice or with reckless indifference to Ms. Myers' protected rights within the meaning of CADA.

71.     NSF is liable for the acts and/or omissions of its agents and employees.

72.     NSF either directly or by and through its agents, discriminated against Ms. Myers on the basis of her status as a pregnant woman.

73.     As a direct and proximate consequence of NSF's illegal conduct, Ms. Myers has sustained significant injuries, damages, and losses.

### SECOND CLAIM FOR RELIEF
**C.R.S. § 24-34-402**
**Sex Discrimination Based on Sex Stereotyping and/or "Sex Plus" Discrimination**

74.     Plaintiff hereby incorporates all the paragraphs of this Complaint as though fully incorporated herein.

75.     The CADA prohibits sex discrimination on its face. "It shall be a discriminatory or unfair employment practice for an employer to refuse to hire . . . against any person otherwise qualified because of sex. . ." C.R.S. § 24-34-402(1)(a).

76.     Sex discrimination can take many forms, including intersectional discrimination against women who become pregnant or who have young children.

77. Courts have also long recognized "sex-plus" discrimination claims. Under a "sex-plus" theory of discrimination, animus against women affects female employees because of their sex plus another characteristic. *Coleman v. B-G Maint. Mgmt. of Colorado, Inc.*, 108 F.3d 1199, 1203 (10th Cir. 1997) ("[the law] only forbids discrimination against women in general, but also discrimination against subclasses of women[.]"). In other words, an adverse employment decision gives rise to an action for sex discrimination "if a female plaintiff shows that she would not have been terminated if she had been a man." *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1047 (10th Cir. 2020).

78. Additionally, courts recognize sex-stereotyping as a form of invidious sex discrimination. It is unlawful for an employer to make an employment decision adversely affecting a female applicant based on stereotypes or assumptions about how child-rearing may impact her work. In other words, caselaw "stand[s] for the proposition that unlawful sex discrimination occurs when an employer takes an adverse job action on the assumption that a woman, because she is a woman, will neglect her job responsibilities in favor of her presumed childcare responsibilities." *Chadwick v. WellPoint, Inc.*, 561 F.3d 38, 44-45 (1st Cir. 2009)

79. As a pregnant woman, Ms. Myers was a protected person under CADA.

80. As a mother of two young children, Ms. Myers is a protected person under CADA.

81. Ms. Myers was a highly qualified candidate for the Director of Global Talent Acquisition position at NSF.

82. NSF discriminated against Ms. Myers based at least in part because of her sex.

83. NSF's refusal to hire Ms. Myers occurred under circumstances giving rise to an inference of illegal sex discrimination, including but not limited to, the abrupt withdrawal of its

intended job offer and the fact the fact that NSF treated Ms. Myers less favorably than her similarly situated male counterparts.

84.     NSF's purported reasons for not hiring Ms. Myers were mere pretext for unlawful sex discrimination.

85.     Ms. Myers' sex and pregnancy were a motivating factor in NSF's adverse treatment of her, including but not limited to its refusal to hire her.

86.     NSF engaged in this conduct with malice or with reckless indifference to Ms. Myers' protected rights within the meaning of CADA.

87.     NSF is liable for the acts and/or omissions of its agents and employees.

88.     NSF either directly or by and through its agents, discriminated against Ms. Myers on the basis of her sex and status as a pregnant person.

89.     As a direct and proximate consequence of NSF's illegal conduct, Ms. Myers has sustained significant injuries, damages, and losses.

### THIRD CLAIM FOR RELIEF
C.R.S. § 24-34-402
Retaliation

90.     Plaintiff hereby incorporates all the paragraphs of this Complaint as though fully incorporated herein.

91.     Ms. Myers engaged in protected activity when she notified Debbie Shapiro, who then notified NSF, that she would need time off for maternity leave or to postpone her start date until after she had her baby.

92.     NSF engaged in a materially adverse action that would dissuade a reasonable person from engaging in protected activity when it changed course and decided not to hire Ms.

Myers two days after Ms. Myers disclosed that she was pregnant and would require maternity leave or a delayed start.

93.     NSF's retaliation against Ms. Myers occurred under circumstances giving rise to an inference of unlawful retaliatory motive, including but not limited to the fact that a mere two days elapsed between the time Ms. Myers disclosed her pregnancy and NSF's retaliatory decision not to hire her.

94.     NSF engaged in this conduct with malice or with reckless indifference to Ms. Myers' protected rights within the meaning of CADA.

95.     NSF is liable for the acts and/or omissions of its agents and employees.

96.     NSF either directly or by and through its agents, retaliated against Ms. Myers on the basis of her sex and/or pregnancy.

97.     As a direct and proximate consequence of NSF's illegal conduct, Ms. Myers has sustained significant injuries, damages, and losses.

## PRAYER FOR RELIEF

**WHEREFORE,** Ms. Myers respectfully requests that the Court enter judgment for the following relief:

      a.   Actual economic damages as established at trial;

      b.   Compensatory damages, including, but not limited to those for future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, and other non-pecuniary losses;

      c.   Front pay;

      d.   Punitive damages as allowed by law in an amount to be determined at trial;

      e.   Pre-judgment and post-judgment interest at the highest lawful rate;

  f.  A tax penalty offset;

  g.  Attorneys' fees and costs as allowed by law; and

  h.  Such further relief as justice so requires.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO**

**TRIABLE.** DATED: December 8, 2022

        RATHOD | MOHAMEDBHAI LLC

        *s/ Ciara M. Anderson*
        Ciara M. Anderson
        Iris Halpern
        2701 Lawrence Street, Suite 100
        Denver, CO 80205
        (303) 578-4400 (t)
        (303) 578-4401 (f)
        ca@rmlawyers.com
        ih@rmlawyers.com

        ATTORNEYS FOR PLAINTIFF